STEBBINS v. THE LANCASHIRE INS. CO.

Where an agent of an insurance company, authorized to issue policies, writes and delivers a policy to another agent from whom the application was received, charging the premium to such agent under a business arrangement between them, and the policy is delivered to the insured, the contract of insurance is complete; and, in the absence of fraud, it can be terminated only in conformity to the stipulations of the policy, or by agreement of the parties.

An agent of an insurance company has no authority to insure property already destroyed; and a policy written and intended as a substitute for a subsisting policy in another company, but not delivered, and of which the assured has no knowledge until after the property is destroyed by fire, is not a valid contract of insurance.

COVENANT BROKEN, on a policy of insurance.   Plea, the general issue.

The plaintiff's evidence tended to prove, that in April, 1877, he lived in Hinsdale, and owned a building occupied for stores and offices; that F. J. Barber, an attorney and insurance agent, had an office in the building, and the plaintiff employed Barber to get him good insurance to the amount of $4,667, at a rate not exceeding two per cent.; that nothing was said as to when the premium should be paid, but the plaintiff was good and able to pay on demand; that Barber had an arrangement with one Doolittle, of Keene, an insurance agent, to place insurance that Barber could not place in companies he represented, on some division of the commissions, he being responsible for the premiums; and Doolittle had an arrangement with the firm of Jenne & Sherman, insurance agents of Brattleboro', Vt., under which each gave to the other applications for insurance they could not place, the agent furnishing it being liable for the premium; that Jenne & Sherman had the ordinary powers of insurance agents, and were liable to their companies for the premiums, less their commissions, and settled once a month with them; that they were agents for the Commercial Union, the German American, the Phenix of New York, the North British & Mercantile, and the Lancashire; that Barber had no companies in which he could place the plaintiff's risk, and he sent it to Doolittle under the arrangement; and Doolittle, having no companies in which he could place it, sent it to Jenne & Sherman; and they, April 3d, 1877, wrote two policies for the plaintiff, each for $2,333.50,—one in the Commercial Union, the other in the German American,—for one year, to commence that day, at noon, charged the premium to Doolittle, and sent him the policies by mail; that Doolittle was agent for the German American, and had a policy on personal property in the same building, and he,

knowing that the company would not accept another risk, returned the policy to Jenne & Sherman to be cancelled; that they received it about the 5th of April, cancelled it, wrote another policy in the Phenix, of New York, for the same sum, dating it April 3d, notified the company, and they, not liking the risk, ordered it cancelled; that Jenne & Sherman cancelled it, and immediately wrote a third policy for the same amount in the North British and Mercantile, reported it to the proper office of the company, charged the premium to Doolittle according to the arrangement, and about April 8th sent the policy to him; and he, on the 17th, and before any notice of a desire of the company to recall the policy, delivered it to Barber, the plaintiff's agent; that, April 13th, the company wrote Jenne & Sherman that they preferred not to carry the risk, and advised that it be placed elsewhere, and, April 15th, they wrote on the margin of the record of the policy in their office, "Cancelled April 13th, 1877;" the policy not being then in their possession, they gave no notice to the company that the policy was cancelled till April 23d, after seeing Barber; that Jenne & Sherman wrote the policy in suit the 17th or 18th of April, and dated it the third, for the same sum in the prior policies, for one year from its date, and it is in other respects in the usual form of like policies, and it remained in their office till the 19th, when it, with a letter of that date duly directed to Doolittle, was mailed, requesting him to exchange it for the one in the North British; that the letter and policy were not received by Doolittle till the afternoon of the 20th, and not till after he had heard that the building had been burned; if the letter had been mailed before three o'clock of the 19th, it would have reached Keene the same day, but it did not appear at what time in the day it was mailed; that the building was destroyed by fire about two or three o'clock of the morning of the 20th; that at the time the fire was discovered, Barber, as the agent of the plaintiff, had the policy in the North British and other policies of the plaintiff in his possession, in his office, in the building, and during the fire he gave them to the plaintiff, and he paid Barber the premium on the North British, $46.67; that the plaintiff before this time knew that he was insured, but did not know in what companies, and had no knowledge as to what had been done between Barber, Doolittle, and Jenne & Sherman as to it; he supposed when he paid his money and received his policies in the Commercial Union and North British that they were in force, and that he was paying the premiums on those policies and no others, and Barber had not then any knowledge of the policy in suit; that Doolittle, April 21st, wrote to Barber, enclosing the policy in suit and Jenne & Sherman's letter of the 19th, asking Barber to send the North British policy in exchange to Jenne & Sherman, which Barber received about 10 o'clock A. M.; he immediately saw the plaintiff and showed the same to him, and the plaintiff gave him the North British policy, with directions to

see Jenne & Sherman, and on the 23d he did see them, and they, thinking that the policy in suit was the one in force at the time of the fire, he paid them the premium on that policy, and took a receipt to Doolittle for the same, to whom they had charged it, and gave to them the North British policy; that proofs of loss were made by the plaintiff against both companies, and the defendants were duly notified; that if the plaintiff is entitled to recover, his damages are $2,134 and interest from the time the loss was payable; that the special agent of the defendants to supervise agencies, examine risks, and adjust losses, under the direction of his superiors to meet with the agents of other companies on the 30th of April to adjust the loss, met at that time, and not being able to adjust the loss, signed a submission to have it determined by arbitration; but it appeared that at the time of the direction, and at the time of the signing, neither the defendants nor the agent had any knowledge of the circumstances as to the liability of the defendants. unless the knowledge of Jenne & Sherman was their knowledge, and that when the circumstances did come to their knowledge they denied their liability, refused to go forward in the arbitration, and returned to Jenne & Sherman the premium when sent to them as a part of their monthly settlement. The evidence also tended to prove that Barber had no authority to get insurance for the plaintiff for a greater sum than $4,667, and that this sum was covered by the two first policies of $2,333.50 each, and that Jenne & Sherman were the agents of the companies for which they assumed to act, but that they had no authority to take risks on property that had been destroyed.

The North British and Mercantile policy contained this agreement: " This insurance may also be terminated at any time, at the option of the company, on giving notice to that effect, and refunding a suitable proportion of the premium for the unexpired term of the policy."

Motion for a nonsuit.

*Lane & Dole* and *Davenport & Eddy* (of Vermont), for the plaintiff.

These inferences and conclusions seem clearly to follow from the facts in this case :

1. That neither the plaintiff or his agents, nor the defendants or their agents, intended to have the same interest insured in two different companies at the same time. The defendants' agents clearly understood that they had cancelled all previous policies which had covered the same before making another contract; and each was supposed to be in force from the time the policy was made; and the agents were authorized and expected, if one policy was for any reason cancelled, to renew the insurance in another company, and so they did. The plaintiff claims that this contract

was good against the defendants from the time that it was put in form by his agents for that purpose. *Goodall* v. *Ins. Co.*, 25 N. H. 169, 192 ; 3 Kent 260.

2. The North British was not in force at the time this policy was made. Their agents had revoked it as they were required to do by that company. They had a right to have it cancelled by giving notice and repaying a proper proportion of the premium. But no premium had passed to their hands or was collected, so that none was to be repaid ; and bare notice to the agent who was acting for both parties must be a compliance with the terms of the policy. The agents' duty to the plaintiff was performed by keeping him insured in some good company, and to the defendants by attending to the business for which they were employed. These agents appeared to do only what should have been reasonably expected of them under all the circumstances ; and good faith requires all the parties to abide by the consequences which resulted from their acts. The above principles, it seems to us, are sustained by the court in the *Atlantic Ins. Co.* v. *Goodall*, 35 N. H. 328, 337 ; *id.*, 29 N. H. 182, 197.

3. The defendants' agents did all that was done in effecting these different insurances. They were cognizant of all the circumstances existing at the times these contracts were made, for they made them and cancelled them. What they did relating to this business in the name of the defendants, the defendants themselves did. What they knew the defendants knew, and are bound by it. G. L., *c.* 172, *ss.* 2, 3. If it was insured at the time in the North British, the defendants knew it ; if the defendants made a contract with the plaintiff under those circumstances, and afterwards induced him through the representations of their agents to surrender his policy, the defendants should be estopped from denying the validity of such contract. *Pierce* v. *Ins. Co.*, 50 N. H. 297, 301 ; *Patten* v. *Ins. Co.*, 40 N. H. 375, 381, and cases cited.

4. But if these agents failed in making a technical cancellation of the North British, as they intended to do, and supposed they had done, that was a mistake which would not avoid the policy that was made as its substitute, for there is no pretence of fraud. The defendants knew what was intended to be done, and what actually was done, by their agents at the time they made the insurance, and now claim the right to repudiate it. Good faith would hardly permit this to be done. The statute above referred to, we submit, would regard it, if need be, a " mistake," which would not affect the insurance. *Campbell* v. *Ins. Co.*, 37 N. H. 35 ; *Clark* v. *Ins. Co.*, 40 N. H. 333.

Or if the court should hold that the North British was in force at the time this policy was made and the property was destroyed so as to constitute a double insurance, the only effect it could have under the terms of the policy upon the plaintiff's right to recover would be to limit it so that he should recover " no greater propor-

tion of the loss sustained than the sum hereby insured bears to the whole amount insured thereon," which in this case would be one half of the loss—$1,067, and interest.

*Cushing* and *Batchelder & Faulkner*, for the defendants.

1. The North British policy became a valid and binding policy April 17, 1877, when Doolittle delivered it to the plaintiff's agent, Barber, and nothing had at the time of the fire been done to terminate the risk.   *M. Steam Mills Co.* v. *W. A. Co.*, 125 Mass. 110.

2. The insurance called for by the plaintiff, by his agent Barber, was then fixed, and the agents Jenne & Sherman could make no further insurance for him, except on further application.

3. Doolittle being the agent of the defendants, and not of the plaintiff, the mailing of the policy to Doolittle, April 19th, was not a mailing to the plaintiff.   It is essential to a delivery that the instrument should pass from the control of the grantor to that of the grantee.   If the policy had been mailed to the plaintiff or his agent, and such delivery was expressly authorized, or to be inferred from the course of business, that might perhaps have been a delivery.   The delivery to Doolittle was not absolute, but only with directions to exchange it for the North British, which was not done, and could not be done.

4. The property having been burned, and the liability of the North British Company fixed, Jenne & Sherman had no authority to transfer that liability from that company to the Lancashire, even with the plaintiff's consent.

5. The transaction after the destruction of the property, between Jenne & Sherman and Barber, was of no effect, it being clearly beyond the authority of the agents to insure property which had been destroyed.

6. Neither could this transaction operate as an estoppel, because it seems clear enough that an agent could not create an estoppel against his principal, by acts which his agency did not authorize him to do.

7. The special agent submitted the question of damage to referees without any knowledge of the invalidity of the policy.   The submission could not give validity to a policy which no agent could have had authority to make directly.   He also acted in ignorance of the circumstances.

CLARK, J.   The plaintiff employed Barber to procure insurance on his building to the amount of $4,667.   Respecting the policy in the Commercial Union, written April 3, 1877, for $2,333.50, no question is raised, and the policy written by Jenne & Sherman in the North British & Mercantile for $2,333.50 covered the remaining insurance called for.   This policy was forwarded to Doolittle, and by him delivered to Barber, the plaintiff's agent, and accepted

April 17, 1877, and the full amount of insurance authorized by the plaintiff was then secured.

The North British policy, issued upon the application of the plaintiff by the authorized agents of the company, when delivered to the plaintiff's agent and accepted, became a completed contract of insurance which could be terminated only in conformity to the terms of the policy, or by agreement of the parties. The right to terminate the insurance upon giving notice and refunding the premium for the unexpired term was reserved in the policy; and it appears that the company, upon being informed of the risk, notified their agents that they preferred not to carry it, and advised that it be placed elsewhere, and that the agents attempted to change the risk and place it in the Lancashire Company. But the act of the agents in cancelling the policy upon their books and writing a policy in the Lancashire Company and forwarding it as a proposed substitute was ineffectual to terminate the contract of the North British Company until notice had been given to the plaintiff or his agent; and no such notice was received by the plaintiff, his agent Barber, or Doolittle, until after the liability of the North British Company had become fixed by the destruction of the property by fire. After the liability of the company had become absolute, notice of their previous election to terminate the risk was of no effect. The North British policy was in force at the time of the fire. *M. Steam Mills Co.* v. *W. A. Co.*, 125 Mass. 110.

The Lancashire policy never became a binding contract. When insurance on the plaintiff's building to the required amount had been secured in the Commercial Union and North British companies the plaintiff's application had been filled, and no authority remained for placing other insurance upon the property. The Lancashire policy therefore was unauthorized by the plaintiff; and, although written in good faith by the authorized agents of the company, and designed as a substitute for the North British policy, it could have no operative force until it was accepted by the plaintiff. It was not an acceptance of a proposition for a contract of insurance, like the case of a policy issued on a previous application, which, as in the cases cited by the plaintiff, takes effect upon the acceptance of the application. As neither the plaintiff nor his agent had any knowledge of the existence of the policy previous to the fire, it was not an existing contract of insurance when the loss happened, and the subsequent delivery was ineffectual to give it validity.

The delivery of the Lancashire policy after the fire was unauthorized, and there is no estoppel. The acts of an agent are binding upon the principal only when done within the scope of the agent's authority. The agents of the Lancashire Company had no authority to insure property which had been destroyed. When the fire occurred, the North British policy was in force and the Lancashire policy had not attached. The latter was designed as a

substitute to take effect upon the termination of the risk of the former. By the destruction of the property the liability of the North British Company became absolute, and the contingency, upon the happening of which the Lancashire policy was to become operative, was no longer possible; and the attempt to transfer the loss to the Lancashire Company, being an unauthorized act of the agents, created no estoppel against the Lancashire Company. Neither did the agreement of the special agent to submit the question of damages to arbitration, made in ignorance of the facts, operate to give validity to the policy. Not being in force when the loss occurred, it is not binding upon the defendants.

*Nonsuit.*

BINGHAM, J., did not sit: the others concurred.